IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

AUG 25 PM 3:43

U.S. DIST... COUR.
N.D. OF ALABAMA

| | |
|---|---|
| SHEILA D. TRIPLETT-HOWARD, } | |
| } | |
| Plaintiff, } | |
| } | |
| v. } | CASE NO. CV 01-B-3282-NE |
| } | |
| THE BOEING COMPANY, } | **ENTERED** |
| } | |
| Defendant. } | AUG 2 5 2003 |

### MEMORANDUM OPINION[1]

Currently before the court is a Motion for Summary Judgment filed by defendant, The Boeing Company ("Boeing"). Plaintiff, Sheila Triplett-Howard, filed suit alleging that defendant, plaintiff's employer, failed to promote her because of her race and sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and because of her race, in violation of 42 U.S.C. § 1981. Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's motion is due to be granted.

---

[1] At the conclusion of oral argument, the court informed the parties of its intention to grant summary judgment in favor of defendant. The court requested that counsel for defendant prepare a proposed memorandum opinion for the court. Although the court has made some changes to the opinion prepared by defendant's counsel, it has adopted a large part of the proposed opinion. The court is aware of the admonition of the Eleventh Circuit that district courts not delegate "the task of drafting important opinions to litigants." *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373 n.46 (11th Cir. 1997). This is an important opinion. Before requesting a proposed opinion from defendant's counsel, the court had reached a firm decision as to the appropriate outcome. Counsel drafted the opinion according to the express instructions of the court as to its contents. These instructions were stated to defendant's counsel, with plaintiff's counsel present, following oral argument. Although largely taken from the opinion proposed by defendant's counsel, the court personally reviewed this opinion, and the opinion reflects the court's own conclusions.



## I. FACTUAL SUMMARY

### A. Plaintiff's Employment Background

Plaintiff, who is an African-American, was hired by defendant in 1996 as a Senior Contracts & Pricing Specialist. (Pl. Dep., Ex. 1, Resume at 1.) Plaintiff had no supervisory authority in this job, but she did train and assist new employees. (Pl. Dep. at 31.) In 1998, plaintiff was promoted to Principal Contracts Administrator. (*Id.* at 35-36; Resume at 1.) Prior to joining Boeing, plaintiff had approximately seven years of combined contracting experience with the U.S. Air Force Air Mobility Command and the U.S. Army Aviation Systems Command. (Resume at 2.) Plaintiff had approximately one year of supervisory authority while holding jobs with these military commands. (Pl. Dep. II at 4-7.) Before that, for approximately three years, plaintiff owned and operated a retail jewelry store. (Resume at 2.) Plaintiff supervised one jewelry repair employee while operating this business. (Pl. Dep. II at 7.)

### B. Promotions of Plaintiff and Williams to Management Jobs

In May 1999, plaintiff was promoted to Manager, Contracts & Pricing, a K-level (first level) management job. (Resume at 1; Pl. Dep. at 37-38, 45.) For slightly less than two years, plaintiff was responsible for ten to eleven contract employees under the SPACEHAB and Space LAB programs, and as the Department of Defense Contracts and Pricing Manager for a program which later became known as the Theatre Air and Missile Defense (TAMD) program. (Pl. Dep., Ex. 3, at 15, 16, 17, 18, 19 (respectively Huntsville Contracts & Pricing Charts of 9/28/00, 8/2000, 02/28/01, 03/08/01, and 03/27/01); Pl. Dep. at 47-49.) As of the Spring of 2001, plaintiff's boss was David Toler (white male). (Huntsville Contracts & Pricing Chart of 9/28/00.)

In August 2000, Joe Williams (white male) was promoted to Contracts & Pricing Administrative Manager. (Lee Aff., Ex. 1, Williams Work History.) Williams was responsible for the Short Range Air Defense (SHORAD) Program, where he had worked for several years and where he was supervised by Toler. (*See* Huntsville Contracts & Pricing Chart of 8/2000.)

### C. Williams's Employment Background

Prior to his August 2000 promotion, Williams had worked as a contracts and pricing administrator for Boeing for eighteen years; as a supervisor for the Supply Contracting Branch of McConnell Air Force Base for one year, where he supervised ten employees; as Executive assistant, Contracting Division at Loring Air Force Base for three years where he was responsible for twenty six employees; as Chief Contract Administrator and Chief of Supplies at the USAFE Contracting Center for three years; as a Buyer/Administrator for three and a half years; and as a Finance Specialist for eleven years. (Lee Aff., Ex. 2, Williams Resume.)

### D. Boeing's Management Selection Process for Consolidated Organizations

Due to the nature of Boeing's business, occasionally organizations within the Company are consolidated or reorganized. As a result, sometimes jobs, including management jobs, are eliminated. When reorganization results in the elimination of one or more management jobs, Boeing policy provides that all current employees who are qualified may apply and be considered for newly-created consolidated management jobs. (Lee Aff. ¶ 3; *id.*, Ex. 3, Boeing-Huntsville Selection Process.) Under this policy, qualified candidates are assessed through a panel interview consisting of the selecting (or hiring) manager, a human resources representative, and one or more other interested managers. (Boeing-Huntsville Selection

Process.) This policy was revised in June 2001 but the circumstances under which the policy was to be applied remained the same. (Lee Aff. ¶ 3; *id.*, Ex. 4, Consolidation Procedure and Functional Deployment Procedure.)

E. **Reorganization of Contracts & Pricing Department**

In the Spring of 2001, Boeing reorganized in recognition of "the emerging government trend to lessen the distinction between National and Theater Missile Defense." (Pl. Dep., Ex. 6, Announcement of 03/23/2001.) As a result, on March 23, 2001, SHORAD, Patriot Advanced Combat (PAC) 3, and TAMD were consolidated into one organization, known as Air & Missile Defense Systems ("A&MDS"). (*Id.*) Tom Walmsley was named Director, Air & Missile Defense, Huntsville. (*Id.*) Supervision of the three TAMD contract employees assigned to plaintiff was transferred to Williams since TAMD and PAC 3 were being consolidated with SHORAD, the program in which he was contracts manager, (Etheridge Aff. ¶ 2; Toler Dep. at 55-57), and Williams's job was re-titled A&MDS Contracts Manager. (Pl. Dep. 69, 73-74; *id.*, Ex. 3 at 20 (Huntsville Site Contracts & Pricing Chart of 04/24/01).)

When the program managers met to discuss the impact of the planned reorganization, the program organization charts that were referenced did not identify plaintiff as a manager in the TAMD program because, program-wise, she was assigned to "Other Program – Direct," as her SPACEHAB and Space Lab, rather than her TAMD, responsibilities were considered primary. (Etheridge Aff. ¶ 2.) The functional organization charts identifying plaintiff as having some TAMD contracts responsibilities were not used in planning the reorganization.[2] (*Id.*) Williams,

---

[2] The charts provided by plaintiff and identified as part of Exhibit 3 to her deposition are functional organization charts. (Etheridge Aff. ¶ 2.)

4

on the other hand, was identified as a contracts manager in the SHORAD program, where he had been a manager since August 2000 and had worked for several years. (*Id.*)

After the reorganization, plaintiff retained responsibility for seven employees in the SPACEHAB and Space Lab Programs. (Huntsville Site Contracts & Pricing Chart of 04/24/01.) The changes in Williams's job did not result in any increased pay, benefits or other compensation. In addition, although his day-to-day job title changed, his job remained a K-level management job. (Lee Aff. ¶ 4; Williams Work History.) Similarly, aside from the transfer of the three TAMD employees to Williams's supervision, plaintiff's K-level management job did not change as a result of the reorganization and she retained the same pay, benefits, and hours. (Lee Aff. ¶ 4; Lee Aff., Ex. 5, Pl. Work History.)

Shortly after the reorganization, plaintiff asked Toler what effect it would have on her job, other than the reassignment of the TAMD employees. Toler advised her that she still retained responsibility for the remaining functions and employees. (Pl. Dep. at 75-76.) Plaintiff asked Toler who decided that Williams would be the A&MDS Contracts Manager, and plaintiff testified that Toler told her that "[Walmsley] would never consider [her] over [Williams] for that job . . . because he was the incumbent." (*Id.* at 125-26.)

### F. Elimination of Plaintiff's Job

Several months after the reorganization, business managers for SPACEHAB and Space Lab advised Toler that they could no longer fund plaintiff's job through their programs. (Toler Aff. ¶ 2.) Sometime between late May and mid-June 2001, Toler informed plaintiff of his concern and urged her to try to locate funding sources from other programs that would enable her job to remain in existence. (*Id.*; Pl. Dep. 99-100, 103, 105; *id.*, Ex. 8, Intake Questionnaire.)

Plaintiff contacted the business managers for other programs, who informed her that their budgets were tight but that they could provide some funding for her, if she used their budgets "sparingly." (Pl. Dep. at 103-05.) Plaintiff advised Toler of her results but he responded that these business managers previously had informed him that they no longer had any budget for her and that she needed to get their funding commitments in writing. (*Id.* at 105, 109-11.) Plaintiff understood that her job was going to be eliminated unless she obtained confirmed budgeting commitments from at least three other programs but admits that, at most, she *may* have obtained written approval for funding from one program. (*Id.* at 105-07, 108-09.)

Beginning in July 2001, Toler suggested to plaintiff that she consider taking an available Level 4 Contract Administrator job in either the Advance Lab or in SPACEHAB, with the same pay, benefits and hours. Toler also offered to allow plaintiff to remain in her current job on a part-time basis. Plaintiff advised him that she would remain in her current job "as is" until it officially was declared as surplus. (Pl. Dep. at 111-14)

### G. Plaintiff's Internal EEO Complaint

In early July 2001, plaintiff met with Allen Etheridge, Workforce Planning and Compensation Manager, and asked him about the decisionmaking process regarding the reorganization of the Contracts & Pricing Department. Etheridge informed plaintiff that Program Manager Walmsley was the decisionmaker. (Pl. Dep. at 120-21.) Etheridge attempted to explain the reorganization process to plaintiff. (Etheridge Aff. ¶ 3.) Plaintiff recalls that Etheridge stated that Williams did not have to compete for the job he had been in since March 2001 because he was the incumbent. (Pl. Dep. at 122-23.) Etheridge advised plaintiff to meet

6

with Florence Lee (white female), Manager, Employee Relations and EEO Programs, if she wanted to file a complaint. (*Id.* at 128-29.)

The following day, plaintiff met with Lee and reiterated her concerns over the process for placing Williams in the A&MDS Contracts Manager job, as well as her concerns regarding the elimination of her own job. (Pl. Dep. at 130-34; Pl. Dep. II at 22-23.) Lee advised plaintiff that she was aware of budget problems in the programs affecting her and that this truly was the cause for her imminent surplus. (*Id.*) Lee added that she would look further into the decision regarding the selection of Williams and get back to plaintiff. (*Id.*) The next day, plaintiff again met with Lee, who tried to explain the process that Walmsley used in reorganizing the Division. Plaintiff was dissatisfied with Lee's explanation and stated that she wanted to file a complaint. (Lee Aff. ¶ 5.)

Plaintiff returned about one week later and, on July 13, 2001, filed an internal EEO complaint. (Pl. Dep.136-39; Intake Questionnaire.) In her internal complaint, plaintiff reiterated her dissatisfaction with the process for identifying Williams as the A&MDS Contracts Manager and of the imminent elimination of her job. (*See* Intake Questionnaire.) Although she listed race and sex as the basis for her complaint, nowhere in the complaint does she identify any particular comments or conduct that suggest either race or sex discrimination. *See id.* Plaintiff testified that the complaint of race and sex discrimination in her internal statement were based on the fact that she was the only African-American female in the organization. (Pl. Dep. at 142-43.) Plaintiff admits that at the time she filed her internal complaint, no one had said anything derogatory or had done anything to her that suggested a race- or sex-based motivation. (*Id.* at 143-45.)

7

**H. Competing of A&MDS Contracts Manager Job and Ultimate Selection of Williams**

Based on his conversation with plaintiff, Etheridge learned for the first time that the reorganization affected plaintiff's job due to her former responsibilities over TAMD contract employees. (Etheridge Aff. ¶ 4.) Etheridge and Lee discussed the situation and consulted with Nickee Reynolds-Mahoney, who was Director of Human Resources. They concluded that, although plaintiff's job had only been modified rather than eliminated as a result of the March 2001 reorganization, arguably the Organization Consolidation Procedure should have been applied. (*See* Consolidation Procedure and Functional Deployment Procedure.) Therefore, giving plaintiff the benefit of the doubt, Human Resources recommended, and Walmsley agreed, to compete the A&MDS Contracts Manager job that Williams had been performing. (Lee Aff. ¶ 6; Etheridge Aff. ¶ 4.) On July 12, 2001, Lee advised plaintiff that "[d]ue to the consolidation of TAMD, Shorad and Pac-3, candidates will be interviewed for the Manager – Contracts, A&MD the week of 23 July 2001." (Pl. Dep., Ex. 10, Email from Plaintiff to Lee of 7/13/2001; Pl. Dep. II at 23-24; Lee Aff. ¶ 6.)[3]

Plaintiff and Williams were the only qualified candidates considered for the job and, in accordance with the Consolidation Procedure, each was interviewed by a panel consisting of Toler; Matt Laing (white male), Finance Manager – A&MDS Huntsville; and Lea Gradford (African-American female), HR Specialist 3. (Pl. Dep. at 192.) During the interviews, each interviewer rated the candidates on their responses to questions in eight different categories,

---

[3]Initially plaintiff contended that she was not advised of the interview until *after* she filed her EEOC charge. (*See* Pl. Dep. at 147-48.) The documents submitted by defendant demonstrate that this was not the case. (*See* Intake Questionnaire; Email from Plaintiff to Lee of 7/13/2001; Pl. Dep., Ex. 7, EEOC Charge.)

8

including for example, "Contracts and Pricing Management Experience," "Leadership Experience and Skills," and "Communication Skills." (*See, e.g.*, Lee Aff., Ex. 6 at 3.) Because both candidates were considered at least minimally qualified based on job experience, education and day-to-day performance, the determination of who would be offered the job was based entirely on the results of the panel interview process. (Toler Dep. at 11-18, 68-69.)

Toler, Laing and Gradford did not discuss the interviews or the interview process prior to or during the process and their conversations following completion of the interviews were limited to stating, without discussion, the scores that each had assigned to the answers provided by the candidates. Each interviewer determined and registered his or her score independently. (Toler Dep. at 5-16, 44-46.) Following completion of the interviews, plaintiff's scores and those of Williams were tabulated. (*Id.* at 46.) Out of a combined maximum score of forty, plaintiff received the following overall scores:

> Toler - 23.5
> Gradford - 23.0
> Laing - 24.0.

(Lee Aff., Ex. 6 at 13.) Williams received the following overall scores:

> Toler - 30.5
> Gradford - 29.0
> Laing – 33.0.

(Lee Aff., Ex. 7 at p. 6.) Based on his higher overall scores during the panel interview process, Williams was deemed to be the better candidate and, on August 1, 2001, defendant formally offered Williams the position of A&MDS Contracts Manager, which he accepted. (Toler Dep. at 46; Lee Aff., Ex. 8, Requisition Checklist.)

9

### I. Plaintiff's EEOC Charge and Judicial Complaint

On July 17, 2001, following her internal complaint but prior to the interview and selection process for the A&MDS Contracts Manager job, plaintiff filed a charge of discrimination with the EEOC, alleging race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964. (*See* EEOC Charge.) In her Charge, plaintiff reasserted the allegations that she made in her internal complaint regarding the job at issue and the potential elimination of her own job. Nowhere in her Charge did plaintiff identify any comments or conduct that suggested race or sex discrimination. (*Id.*)

On December 19, 2001, plaintiff filed the Complaint in this court. In her Complaint, plaintiff asserts that in March 2001 she applied for and was denied a promotion to A&MDS Contracts Manager, the job "awarded" to Williams, and that such conduct constituted race discrimination, in violation of Title VII and 42 U.S.C. § 1981, and sex discrimination, in violation of Title VII. (Compl. ¶¶ 6-7.)

### II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255. Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. DISCUSSION

#### A. Plaintiff Has Not Established a Prima Facie Case of Failure to Promote

Plaintiff asserts that she was discriminatorily denied a promotion to the A&MDS Contracts Manager job for which Williams was selected. To establish a prima facie case of either race or sex discrimination in promotions, plaintiff must show,[4] among other things, that she was subjected to an adverse employment action. *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238 (11th Cir. 2001). "[T]o prove adverse employment action in a case under Title VII's anti-discrimination clause, an employee must show a *serious and material* change in the terms, conditions, or privileges of employment." *Id.* at 1239. Furthermore, "the asserted impact

---

[4] Plaintiff has offered no direct or statistical evidence of either race or sex discrimination. Therefore, the *McDonnell Douglas/Burdine* burden-shifting analysis applies. *Miller v. Bed, Bath & Beyond, Inc.*, 185 F. Supp. 2d 1253, 1266 (N.D. Ala. 2002). Furthermore, claims under Title VII and 42 U.S.C. § 1981 are analyzed in the same manner. *Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1109 n.4 (11th Cir. 2001). Finally, because plaintiff's race and sex claims involve the same facts and issues, they will be addressed concurrently.

cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment" and "must be materially adverse as viewed by a reasonable person in the circumstances." *Id.*

In this case, the facts demonstrate that the A&MDS Contracts Manager job for which Williams was selected would at most have constituted a lateral transfer for plaintiff, not a promotion. When Williams's job was revised and re-titled as A&MDS Contracts Manager in March 2001, the only effect of that revision was to add the supervisory responsibility of three additional contracting employees from the former TAMD program. Williams, who was already performing a K-level management job, remained in a K-level management job and received no change in pay, benefits or other compensation as a result of the reorganization. By the same token, the reorganization resulted in no change to *plaintiff's* K-level management job other than the removal of supervisory responsibility for three employees, leaving intact her management responsibility for two programs and seven employees, as well as her pay, benefits and working hours. Indeed, had she been selected as the A&MDS Contracts Manager, she would have been laterally transferred from one K-level position to another. The Eleventh Circuit has held that a purely lateral transfer will not objectively qualify as an adverse employment action. *Doe v. DeKalb County Sch. Dist.*, 145 F.3d 1441, 1449-50 (11th Cir. 1998).[5] Therefore, plaintiff was not subjected to an adverse employment action when Boeing chose Williams instead of plaintiff for the position of A&MDS Contracts Manager.

---

[5]In *Doe*, the court held that a plaintiff transferred from one position to another cannot maintain an ADA action based on an alleged demotion unless the transfer may be reasonably, or objectively, viewed as an adverse employment action. *Doe*, 145 F.3d at 1454. Here, defendant's failure to laterally transfer plaintiff cannot be viewed as an adverse action.

12

Alternatively, plaintiff contends that her failure to be selected for the position constitutes an adverse employment action because she subsequently lost her management job. (Pl.'s Br. at 8.) However, plaintiff is combining two unrelated events, that is, the transfer of her TAMD supervisory duties to Williams in March 2001 as part of a Company reorganization and the subsequent surplusing of her management job in the Summer of 2001, which was unrelated to the reorganization. Toler testified, and Lee substantiated, that budget cuts drove the elimination of plaintiff's management job. (Toler Aff. ¶ 2; Lee Aff. ¶ 5; Pl. Dep. at 99-100, 103, 105, 130-34; Pl. Dep. II. at 22-23; Intake Questionnaire at 2.) Plaintiff alleges that business managers for other programs informed her that they could provide funding for her, (*see* Pl.'s Br. at 2 n.5), but admits that she understood her job was going to be eliminated unless she obtained *written confirmation* of budgeting from at least *three* other programs and further admits that, at most, she *may* have obtained such approval from one program, (Pl. Dep. at 105-09).

Plaintiff has offered no evidence that the loss of funding for her job was caused by the reorganization or, more specifically, that the mere reassignment of supervisory responsibility for three TAMD employees from her to Williams was the basis for the Program Managers' unwillingness to continue funding her job. Because plaintiff has not shown and cannot show that the selection of Williams for the reorganized A&MDS Contracts Manager job and the subsequent elimination of her job were causally related, and because the mere reorganization of her job did not materially alter her job in any substantial way, she cannot establish that the

selection of Williams constituted an adverse employment action and therefore her prima facie case fails.[6]

**B. Plaintiff Has Not Rebutted Boeing's Legitimate, Non-Discriminatory Reason for Its Actions**

Even assuming plaintiff could establish her prima facie case and the job in question constituted a promotion, Boeing has offered legitimate, non-discriminatory reasons for not selecting plaintiff. Initially, plaintiff was not considered for the A&MDS Contracts Manager job because no business manager identified plaintiff's job as being impacted by the reorganization. On the organizational charts used by the decisionmakers during the reorganization, plaintiff was identified as a manager in the "Other Programs – Direct" part of the organization rather than as a TAMD manager. Thus, when the decision was being made to transfer responsibility of the three TAMD employees, plaintiff's involvement was unknown. Williams, on the other hand, was identified as the SHORAD contracts manager and therefore was the identifiable choice to become the contracts manager for the consolidated SHORAD, PAC 3 and TAMD Programs.

Plaintiff argues that Boeing's initial failure to consider her for the A&MDS Contracts Manager job is pretextual because "she was told that Mr. Walmsley did not want her as a department head." (Pl.'s Br. at 9.) As an initial matter, plaintiff has not offered any evidence that Program Manager Walmsley did not want her as a department head. Plaintiff did not testify that Toler told her that Walmsley had made such a statement. Rather, she testified only that *after* Williams already had been selected, Toler opined that Walmsley would not have selected

---

[6]Plaintiff has not asserted an independent claim of discrimination related to the surplusing of her job. Thus, the claims in this lawsuit pertain to the denial of the A&MDS Manager job for which Williams was selected. (Pl. Resp. to Def. Facts No. 27.)

14

plaintiff over Williams because Williams was the incumbent. (Pl. Dep. at 125-26.) Although Toler's statement is hearsay, even assuming Walmsley made such a statement, it does not establish pretext. If Walmsley preferred Williams because he was currently holding the position, this would not be evidence of sex or race discrimination. Accordingly, no reasonable juror would conclude that plaintiff has demonstrated that the defendant's articulated reasons for initially selecting Williams were a pretext for discrimination.

When plaintiff subsequently notified Human Resources that, in fact, her job had been affected by the reorganization, she inquired as to whether the job should have been "competed." After plaintiff's complaint, Human Resources, with the concurrence of Walmsley, decided in the interests of fairness to apply the organization consolidation procedure and to conduct panel interviews of Williams and plaintiff to determine who would fill the job. Based on the independent scores of the three interviewers in the panel interview process, Williams was deemed to be the better candidate and was offered the job. Plaintiff has not offered any evidence that the reasons given for this second decision were a pretext for discrimination.

Plaintiff contends that the interview process was unfair because Toler was one of the interviewers and because he asked about her background at the interview. (Pl. Dep. II at 26-29.) Neither of these facts suggests that Toler was motivated by either a racial or gender bias. In fact, plaintiff admits that, as the manager responsible for the job in question, Toler's participation in the panel interview would be standard procedure. (Pl. Dep. at 156.) Regardless, even if plaintiff had shown that Toler harbored a race or sex bias, there is no evidence that the other two panel interview members were tainted by his alleged bias. In fact, the evidence shows that his involvement in the interview process did not determine the outcome of that process. Toler's

interview scores for both Williams and plaintiff were comparable to the scores of the other panel participants, Laing and Gradford, a black female. Plaintiff admits that she has no problem with how either Laing or Gradford conducted themselves in the interview process or any other complaints about them.

In addition, the fact that plaintiff may believe she is more qualified than Williams does not create a question of fact. Both candidates were considered qualified to hold the job and, therefore, the determination was made via performance during the panel interview rather than by comparing education or experience. Furthermore, "a plaintiff cannot prove pretext by simply showing that she was better qualified than the individual who received the position that she wanted . . . 'Disparities in qualifications are not enough in and of themselves to demonstrate discriminatory intent unless those disparities are so apparent as virtually to jump off the page and slap you in the face.'" *Denney v. City of Albany*, 247 F.3d 1172, 1187 (11th Cir. 2001) (quoting *Lee v. GTE Florida, Inc.*, 226 F.3d 1249, 1253-54 (11th Cir. 2000)). No reasonable jury would conclude that any alleged disparity between plaintiff's and Williams's qualifications meets this test.

In sum, because no reasonable jury would conclude that Boeing's articulated reasons for placing Williams in the A&MDS Contracts Manager position were a pretext for either race or sex discrimination, defendant is entitled to judgment as a matter of law.

## V.  CONCLUSION

For the reasons stated herein defendant's Motion for Summary Judgment will be granted. An Order in accordance with this Memorandum Opinion will be entered contemporaneously with this Opinion.

**DONE** this  25th  day of August, 2003.

*Sharon Lovelace Blackburn*
**SHARON LOVELACE BLACKBURN**
United States District Judge